UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-1540

AMAZING LASH FRANCHISE, LLC,

               Plaintiff,

v.

FATEMA SAYED,
MORTAZA SAYED, and
AMZLASH LLC,

               Defendants.

---

## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

---

Plaintiff Amazing Lash Franchise, LLC ("ALF") submits this Motion for Temporary Restraining Order and Preliminary Injunction against Fatema and Mortaza Sayed (the "Sayeds") and AMZLASH, LLC ("AMZLASH") (collectively, the "Defendants") pursuant to Rule 65 of the Federal Rules of Civil Procedure and D.C.Colo.L.CivR 65.1(a).[1]

---

[1] Given the urgent nature of this matter and to comply with all applicable federal and local rules, ALF is simultaneously requesting a temporary restraining order and preliminary injunction. The first request is appropriate, given the urgent nature of this matter, under F.R.C.P. 65 and D.C.Colo.L.CivR 65.1 allowing the issuance of a temporary restraining order before, and in addition to, a preliminary injunction to last the pendency of this case. To be clear, ALF is not proceeding—or requesting to proceed—without notice to Defendants. Instead, ALF has provided such notice pursuant to D.C.Colo.L.CivR 65.1(a) (*see* fn. 2 below), and simply requests that this matter be heard on an expedited basis. If this Court denies ALF's request for a temporary restraining order, ALF requests that this Court consider ALF's simultaneous request for a preliminary injunction, including by holding an expedited hearing as the Court's calendar allows.

**CERTIFICATE OF CONFERRAL**

Pursuant to D.C.COLO.LCivR 7.1, ALF has conferred with and provided notice to
Defendants' counsel regarding this Motion. (Ex. 6.) Defendants have not responded.[2]

**INTRODUCTION**

ALF, the nation's largest and fastest growing eyelash extension franchise business, seeks
emergency injunctive relief against Defendants, who wrongfully abandoned their franchise
agreement, and are now misappropriating ALF's trade secrets to unlawfully compete against
ALF from their ALF franchise location. If not immediately enjoined, ALF will continue to suffer
irreparable harm as a result of Defendants' improper interference with its client relationships,
misuse of ALF's trade secrets, and attack on ALF's brand.

Defendants have operated an ALF franchise studio since November 2018, under a valid
and binding franchise agreement subject to a ten-year term. While in operation and for the sole
purpose of performing their contractual obligations under the franchise agreement, Defendants
gained access to ALF's confidential, proprietary, and trade secret information. To protect such
information and ALF's business goodwill, Defendants were contractually required to refrain
from having an interest in a competing business during, or within two years after the termination
of, their franchise term.  Defendants are likewise prohibited from using ALF's trade secrets
outside the operation of their franchise or in any other business capacity.

---

[2] Further, on June 7, 2021, ALF provided Defendants' counsel copies of the Complaint and this
Motion by email. Counsel for ALF will further advise Defendants' counsel of the date and time
of the injunctive relief hearing when set. ALF has thus fulfilled the requirements of Rule 65(a)(1)
and D.C.Colo.L.CivR 65.1(a) regarding notice to Defendants.

Despite these and other contractual prohibitions, ALF discovered on June 4, 2021, that the Defendants stopped operating their ALF studio, removed all ALF internal and external signage, and began competing with ALF before the termination of, and in breach of, their franchise agreements. Specifically, Defendants formed and are currently operating Allure Lash and Beauty Bar ("Allure") at the location of their former ALF studio. In connection with this operation, Defendants misappropriated and are using ALF's trade secrets, including ALF's proprietary and particularized client data and information, in violation of state and federal law.

As a result, ALF is, and continues to be, irreparably harmed. Each day Defendants operate Allure using ALF's trade secrets, ALF loses business opportunities, clients, and revenue, and suffers harm to its business goodwill. ALF thus requests that this Court issue a temporary restraining order and preliminary injunction, as set forth in the Proposed Order filed herewith, enjoining the Defendants from unlawfully competing with ALF and barring Defendants from the continued misuse of ALF's confidential, proprietary, and trade secret information.

## STATEMENT OF FACTS[3]

## I. ALF IS A NATION-LEADING EYELASH EXTENSION STUDIO FRANCHISE SYSTEM WITH UNIQUE METHODS AND INNOVATIVE SERVICES

ALF is the nation's largest and fasted growing eyelash extension franchise beauty brand. Established in 2010, ALF began franchising in 2013, and now has approximately 260 locations nationwide. (Ex. 1, Hu Aff. ¶¶ 7-8.) Over the past decade, ALF has developed unique methods to establish, operate, and promote its eyelash extension studios ("Studios" or "Amazing Lash Studios") and related products and services. (*Id.* at ¶ 9.)

---

[3] These facts are likewise set forth in ALF's Complaint, filed simultaneously herewith, ¶¶ 11-59.

As part of its national business model, ALF grants to franchisees the right to establish and operate Studios under the ALF's trademarks according to ALF's particularized standards, specifications, methods, techniques, and operating and other procedures ("System Standards"), which constitute ALF's unique Amazing Lash franchise system. (*Id.* at ¶ 10.) ALF likewise grants franchisees access to ALF's confidential, proprietary, and trade secret information during, and for the sole purpose of, the establishment and operation of their Studios under ALF's System Standards. (*Id.* at ¶ 10.) ALF has invested substantial time, money, and effort in developing its unique System Standards and protecting the secrecy of its confidential, proprietary, and trade secret information. (*Id.* at ¶ 11.) ALF spends significant funds each year on its marketing and branding in the highly competitive beauty industry and has established considerable goodwill and valuable customer recognition. (*Id.* at ¶ 12.)

## II.    ALF ENTERS INTO A FRANCHISE AGREEMENT WITH DEFENDANTS

On November 15, 2018, ALF and the Sayeds entered into a ten-year franchise agreement for Amazing Lash Studio No. 0348, located at 3639 Riverside Plaza Dr. Ste. 520 Riverside, California, 92506. (Ex. 2, Franchise Agreement.)[4] About a year later, the Sayeds transferred their interests under the Franchise Agreement to their jointly-owned entity AMZLASH, via a Consent to Transfer Entity Change contract. (Ex. 3, Consent to Transfer.)

As the owners of AMZLASH, the Sayeds executed a Guaranty and Assumption Agreement, whereby they personally guaranteed the Franchise Agreement and agreed to be

---

[4] ALF and the Sayeds also entered into an Area Development Agreement allowing them to acquire additional franchises and providing them certain development rights. (Area Development Agreement, Ex. 4.) The Sayeds have not exercised their rights or attempted to open an additional franchise pursuant to the Area Development Agreement.

bound by, and liable for the breach of, each and every provision contained therein. (*Id.* at Ex. 2

thereto, "Owners' Guaranty and Assumption Agreement".)  The Franchise Agreement is a valid

and enforceable contract with an expiration date of November 15, 2028. (Ex. 2, § IV.A).

### III.    THE FRANCHISE AGREEMENT REQUIRES DEFENDANTS TO PROTECT AND MAINTAIN THE SECRECY OF ALF'S CONFIDENTIAL, PROPRIETARY, AND TRADE SECRET INFORMATION AND NOT TO COMPETE WITH ALF

Under the Franchise Agreement, Defendants gained the right to access and use ALF's

proprietary, confidential, and trade secret information, consisting of, among other things, "all

proprietary and confidential information relating to the establishment and operation of Amazing

Lash Studios," including all System Standards, all personal information "generated by, or used or

developed in . . . , Amazing Lash Studio[s]," all client information and data, and other trade

secrets ("Confidential Information"). (Ex. 2, §§ I, XI.B). The Agreement provides that all

Confidential Information is proprietary to ALF. Client data and information includes "all

information relating to clients and members of [the] Amazing Lash Studio, including names,

addresses, telephone numbers, e-mail addresses, buying habits, preferences, demographic

information and related information." (*Id.* at §§ VIII.L(3); XI.B.)

ALF has invested substantial time and effort to maintain the secrecy of ALF's

Confidential Information, including by storing such information in highly-confidential,

password-protected databases. (Ex. 1, ¶ 16.) The Agreement thus contains provisions intended to

protect ALF's Confidential Information, including numerous itemized franchisee obligations

applicable during term and post-termination. Among other things, the Agreement:

- requires Defendants to "implement all administrative, physical and technical safeguards that [ALF] require[s] to protect any information that can be used to identify [ALF's clients], including names, addresses, telephone numbers, e-mail

addresses, . . .  financial information, credit card information, biometric or health
data . . . .";

- prohibits Defendants from using ALF's Confidential Information outside
  Defendant's establishment and operation of the Studio or in any other business or
  capacity;

- requires Defendants to maintain the confidentiality of the Confidential
  Information during and after the term of the Agreement;

- prohibits Defendants from making unauthorized copies of any portion of the
  Confidential Information;

- requires Defendants to adopt and implement all reasonable procedures that ALF
  proscribes to prevent the unauthorized use or disclosure of Confidential
  Information; and

- following termination, obligates Defendants to immediately and permanently
  cease to use, in any manner whatsoever, any of ALF's Confidential Information
  and deliver to ALF all Confidential Information and other materials related to
  Defendants' operation of the Studio.

(Ex. 2, § VIII.J, XI.B-C, XIX.A.)

To further protect against the dissemination and use of ALF's Confidential Information,

the Franchise Agreements prohibit Defendants from competing with ALF. The Agreement

contains a "Noncompetition Covenant" that applies during the term of the Franchise

Agreement—and one that applies post-termination. (*Id.* at XI.C.) The in-term noncompetition

covenant provides that Defendants shall not, "directly or indirectly, for themselves or through, on

behalf of, or in conjunction with any other person, legal entity or association":

> (a) divert, or attempt to divert, any current or potential business or
> customer of Amazing Lash Studios to any Competitive Business;
> (b) own, maintain, operate, engage in, or have any financial or
> beneficial interest in, advise, assist, or make loans to, or act as a
> director, officer, manager, employee, consultant, lessor,
> representative, or agent for, any Competitive Business located
> within the United States . . . ; or (c) solicit, interfere, or attempt to

> interfere with our or our Affiliates' relationships with any
> customers, vendors, or consultants.

(*Id.* at § XI.C(1)).

The post-termination noncompetition covenant likewise provides Defendants shall not:

> [F]or a continuous uninterrupted period commencing upon the. . .
> termination . . . of all [Defendants'] interest in this Agreement . . .
> and continuing for two (2) years thereafter, . . . (a) divert, or
> attempt to divert, any current or potential business or customer of
> Amazing Lash Studios to any Competitive Business; (b) own,
> maintain, operate, engage in, or have any financial or beneficial
> interest in, advise, assist, or make loans to, or act as a director,
> officer, manager, employee, consultant, lessor, representative, or
> agent for, . . . any Competitive Business that is or is intended to be
> located at the Studio location, within the Protected Area, within a
> three-mile radius of the Franchise location, or within a three-mile
> radius of the location of any Amazing Lash Studio in existence or
> under construction . . . ; or (c) solicit, interfere, or attempt to
> interfere with our or our Affiliates' relationships with any
> customers, vendors, or consultants.

(*Id.* at § XI.C(2)).

The Franchise Agreement defines "Competitive Business" as:

> [A]ny business (excluding any Amazing Lash Studios operated
> under a franchise agreement with us or our Affiliate) operating, or
> granting, franchises or licenses to other to operate any business
> that offers or sells eye-lash services, eyebrow services, hair
> removal, facial or body treatments or related products or services.

(*Id.* at § I).

The Franchise Agreement further provides that any violation of the restrictive covenants

related to the nondisclosure of Confidential Information and noncompetition covenants will

"result in irreparable injury to [ALF] for which no adequate remedy at law may be available."

(*Id.* at § XI.F). Defendants accordingly consented to "the issuance of an injunction prohibiting

any conduct . . . in violation" thereof, without a requirement that ALF post a bond. (*Id.*).

## IV.   DEFENDANTS IMPROPERLY CEASE OPERATION OF THEIR STUDIO IN VIOLATION OF THE FRANCHISE AGREEMENT AND MISAPPROPRIATE ALF'S TRADE SECRETS TO COMPETE AGAINST ALF

On June 4, 2021—just four days ago—ALF discovered that Defendants have violated the

Franchise Agreement, including the above listed restrictive covenants, in numerous ways that are

causing immediate, ongoing, irreparable harm to ALF. ALF has discovered the Defendants:

- have unilaterally, improperly, and without authorization ceased operating their Studio in violation of the Franchise Agreement;

- opened and began operating a Competitive Business at the Studio location: Allure Lash and Beauty Bar ("Allure"), offering eyelash extension and eyebrow services and related cosmetic products and beauty services. (Ex. 5, Allure Facebook page, created on June 3, 2021 and reflecting the same location address as the Studio.);

- removed all exterior and interior Amazing Lash Studio brand signage – and replaced in-store marketing with Allure's competitive branding and products:





- used their access to ALF's password-protected point-of-sales systems to misappropriate and duplicate ALF's Confidential Information, including client information and data, for the establishment, use, and operation of Allure—to compete with ALF and treat ALF's clients;

- continue to use and distribute ALF's Confidential Information to operate Allure and unlawfully compete with ALF; and

- are interfering with and harming ALF's existing client relationships by refusing to refund clients with pre-paid, unused services with ALF, causing other ALF Studios and ALF itself to incur such costs.

(Ex. 1, ¶¶ 21-30.)

Shortly after learning of Defendants' numerous violations of the Franchise Agreement, on June 6, 2021, ALF shut off Defendants' access to ALF's systems and terminated the Franchise Agreement, effective immediately. (Ex. 6; Ex. 1, ¶ 31.) Upon being notified of the termination of the Agreement, Defendants did not comply with their post-termination restrictive covenants related to confidential, proprietary, and trade secret information—nor did they cease their competitive operations at Allure. (Ex. 1, ¶¶ 32-33.)

In sum, Defendants are unlawfully competing against ALF; are using ALF's misappropriated trade secrets to do so, in violation of their contractual obligations and state and federal law; and will continue their unlawful conduct unless immediately enjoined.

## V.    DEFENDANTS' CONDUCT IS IRREPARABLY HARMING ALF

The Franchise Agreement makes clear that ALF's Confidential Information is proprietary to ALF, contains ALF's trade secrets, and that any unauthorized use or disclosure would result "in irreparable harm to [ALF] for which no adequate remedy at law may be available." (Ex. 2, § XI.C, F.) As a result, the Agreements allow for, and Defendants consented to, "the issuance of an injunction prohibiting any conduct." (*Id.*)

Indeed, ALF's brand was built based on the business goodwill it has developed over the last decade through its customized beauty services. (Ex 1, ¶¶ 12, 35.) By unlawfully competing with ALF and using its trade secrets, Defendants are not only diluting the secrecy of ALF's trade secrets, but also <u>daily</u> depriving ALF of business opportunities, revenue streams, customers, and business goodwill—none of which can estimated or projected with certainty. (*Id.* ¶¶ 36-41.) And worse, Defendants are also refusing to honor some clients' pre-paid, unused services with ALF, seriously harming ALF's relations with its customers and injuring ALF's brand and goodwill. (*Id.* ¶¶ 28, 37-38.) Unless Defendants are enjoined from their improper conduct—*i.e.*, from competing with ALF and using ALF's trade secrets—ALF will continue to suffer increasing and unquantifiable harm. (*Id.* ¶¶ 34-41.)

## **LEGAL STANDARD**

The purpose of emergency injunctive relief is to preserve the status quo and the relative positions of the parties until a trial on the merits can be held. *See Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258–59 (10th Cir. 2005). Under Rule 65, the Court may grant a temporary restraining order and preliminary injunction where the movant demonstrates the following factors: (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of relief; (3) the balance of equities tips in the movant's favor; and (4) the injunction is in the public interest. *DoubleClick Inc. v. Paikin*, 402 F. Supp. 2d 1251, 1255 (D. Colo. 2005). These factors are all satisfied here.

## **ARGUMENT**

In light of Defendants' violation of their non-compete obligations and unauthorized use of ALF's trade secrets to compete against it, which has caused and continues to cause ALF

irreparable harm and serves against the public interest, all four factors weigh in ALF's favor and injunctive relief should be granted. *See*, e.g., *People's Tr. Fed. Credit Union v. Nat'l Credit Union Admin. Bd.*, 350 F. Supp. 3d 1129, 1138 (D.N.M. 2018) ("The requirements for a TRO issuance are essentially the same as those for a preliminary injunction order."); 13 Moore's Federal Practice ¶ 65.36(1), at 65-83 (3d ed. 2004); Fed. R. Civ. P. 65(b).

## I.      TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION WILL PRESERVE THE STATUS QUO

The status quo means the "last peaceable position" existing between the parties before the dispute developed. *E.g., Dry Cleaning To-Your-Door, Inc. v. Waltham Ltd. Liab. Co.*, No. 07-cv-01483-WDM-MJW, 2007 WL 4557832, at *2 (D. Colo. Dec. 20, 2007). Here, the last peaceable position was the world as it existed before the Defendants began unlawfully competing with ALF and before Defendants began using ALF's trade secrets. Injunctive relief barring this conduct will preserve that status quo and immediately prevent the harm already done to ALF from compounding. *See id.* (last peaceable status was when defendant was "bound by the non-compete provision[;] . . . an injunction prohibiting competition would [maintain] the status quo"); *DoubleClick Inc.*, 402 F. Supp. 2d at 1256 (Murphy, J. concurring) (same); *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1013 (10th Cir. 2004) (McConnell, J., concurring) (requiring a party who disturbed the status quo to reverse its actions, "restores, rather than disturbs, the status quo.").

## II.     ALF IS LIKELY TO SUCCEED ON THE MERITS

ALF has asserted claims for breach of contract and trade secret misappropriation, and is likely to succeed on both. (Compl. ¶¶ 60-94.) To demonstrate a likelihood of success on the merits, ALF must "present 'a prima facie case showing a reasonable probability that [it] will

11

ultimately be entitled to the relief sought.'" *Salt Lake Tribune Pub. Co., LLC v. AT & T Corp.*, 320 F.3d 1081, 1100 (10th Cir. 2003); *Continental Oil Co. v. Frontier Ref. Co*., 338 F.2d 780, 781 (10th Cir. 1964). This burden is lower than showing an "overwhelming" likelihood of success, or "positively" establishing a right to relief on the merits. *Atchison, Topeka and Santa Fe Ry. Co. v. Lennen*, 640 F.2d 255, 261 (10th Cir. 1981). And where, as here, the three "harm" factors tip "decidedly" in the moving party's favor, the "probability of success requirement" is relaxed further; the moving party "need only show questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation." *Heidemann v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (internal quotation marks omitted). ALF satisfies this burden.[5]

### A.    ALF Is Likely to Prevail on its Breach of Contract Claim

For breach of contract, ALF must show (1) a valid and enforceable contract; (2) that ALF substantially performed; (3) that the Defendants failed to perform; and (4) resulting damage. *Western Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992). ALF will so establish.

First, the Franchise Agreement entered into between the ALF and the Sayeds on November 15, 2018, as transferred to AMZLASH via the Consent to Transfer on August 8, 2019, is valid and enforceable, and ALF has performed its obligations thereunder. (Exs. 2-3.)

Although Colorado public policy generally disfavors covenants not to compete, the statutory prohibition does not apply to (1) executive management personnel or (2) contracts for the protection of trade secrets. Colo. Rev. Stat. § 8-2-113(2)(b),(d). Both statutory exceptions

---

[5] Even if the Court concludes that the "relaxed" standard does not apply, ALF still meets the traditional standard.

apply here, as (1) the Sayeds operated the Studio, either as individual owners or as joint-owners of AMZLASH, and (2) the non-compete provisions are one of many provisions in the Franchise Agreement designed to protect ALF's trade secrets. (Ex. 1, ¶¶ 13-17; Exs. 2-3.) Indeed, the Agreements recognize the highly confidential, proprietary, and valuable nature of ALF's trade secrets shared in connection with the franchise relationship, and thus contain robust restrictions designed to safeguard that information and prohibit its disclosure. (Ex. 2, §§ VIII.J, XI.B-C, XIX.A.) The Agreement protects ALF's trade secrets from dissemination by, among other things, keeping them in password-protected databases, limiting access, requiring franchisees to return such information upon termination, and prohibiting franchisees from competing with ALF in any capacity with any competing business venture and from using ALF's trade secrets to do so. (*Id.*) Read together, these provisions demonstrate and protect against ALF's substantial concern that a franchisee with access to ALF's trade secrets could otherwise use that information to harm ALF's business during or after departing. As a result, these provisions are valid and enforceable. *See Dry Cleaning To-Your-Door, Inc.*, 2007 WL 4557832, at *2 (recognizing franchise license agreement as covered by trade secret exemption); *I Can't Believe It's Yogurt v. Gunn*, No. Civ.A. 94-OK-2109-TL, 1997 WL 599391, at *21 (D. Colo. Apr. 15, 1997) (same because a "covenant not to compete in franchise relationship is comparable to sale of a business in that primary characteristic of a franchise relationship is the license given the franchisee to exploit franchisor's goodwill").

Non-competition provisions must also be reasonable in duration and geographic scope to be enforceable. *Reed Mill & Lumber Co. v. Jensen*, 165 P.3d 733, 736 (Colo. App. 2006). Covenants not to compete for up to five years, and with nationwide restrictions, have been held

reasonable under Colorado law. *Id.; see also Nutting v. RAM Sw., Inc.*, 106 F. Supp. 2d 1121, 1127 (D. Colo. 2000). Here, both the in-term noncompetition covenant and the two-year, three-mile-radius post-termination noncompetition restriction meet this reasonableness standard.

Second, the Defendants' conduct in taking, copying, and using ALF's trade secrets to compete with ALF by opening and operating Allure at the Studio location before their contract ended (and continuing post-termination) demonstrates flagrant violations of the Franchise Agreement, Ex. 2, including:

- § VIII.J, requiring Defendants to adopt and implement all reasonable procedures that ALF proscribes to prevent the unauthorized use or disclosure of Personal Information;

- § XI.C(1), prohibiting Defendants from competing with ALF during the term of the Agreement;

- § XI.C(2), prohibiting Defendants from competing with ALF post-termination;

- § XI.B, prohibiting the Defendants from misappropriating, copying without authorization, disclosing, or using ALF's Confidential Information, including its client lists and data, in any other business and capacity;

- §§ XI.C, prohibiting the Defendants from interfering with ALF's customer and vendor relationships during or after the term of the Agreement; and

- §§ XIX, proscribing numerous post-termination obligations, including that Defendants "cease to use, in any manner whatsoever, . . . any Confidential Information associated with [ALF]" and "comply with the restrictive covenants contained in [§XI]," including governing the nondisclosure of confidential information and noncompetition covenant.

Third, as explained below, by continuing to violate these and other Franchise Agreement provisions, Defendants have damaged ALF by sabotaging ALF's client relationships, diverting customers and business away from ALF, and damaging its business goodwill.

**B.    ALF's Trade Secret Misappropriation Claims Are Also Likely to Succeed**

Under the Colorado Uniform Trade Secret Act ("CUTSA") and federal Defend Trade Secrets Act ("DTSA"), trade secret misappropriation occurs when a person discloses or uses another's trade secrets obtained by improper means, including through breach of a duty to maintain their secrecy. 18 U.S.C. § 1839(5)-(6); C.R.S. § 7-74-102(1)-(2); *see also Mineral Deposits Ltd. v. Zigan*, 773 P.2d 606, 608 (Colo. App. 1988). And, it is well established under Colorado and federal law that confidential and proprietary client lists and data can constitute trade secrets. *See Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1114 (10th Cir. 2009); *MSC Safety Sols., LLC v. Trivent Safety Consulting, LLC*, No. 19-cv-00938-MEH, 2019 WL 5189004, at *7 (D. Colo. Oct. 15, 2019). This is particularly true where, like here, client lists contain a substantial amount of non-public information that derive great economic value, such as individualized and confidential customer buying habits and preferences and data specific to the list owner's services. *See* C.R.S. § 7–74–102(4); 18 U.S.C. § 1839(3)(B); *Mentor Worldwide LLC v. Craigo*, No. 12-cv-00776-REB-MJW, 2012 WL 1439498, at *3 (D. Colo. Apr. 26, 2012) ("highly relevant information about . . . customers, such as sales histories, buying patterns, . . . and customer preferences, likely are [] trade secrets").

ALF has undergone substantial efforts to protect its trade secrets, including its client information and data. (Ex. 1, ¶¶ 11, 16-17.) As set forth above, ALF's Confidential Information includes ALF's clients' personal information, history, goals, buying habits and preferences, and other customized data particular to ALF's clients—none of which is publicly available. (Ex. 2, §§ VIII.L(3); XI.B.) To protect this and other confidential and proprietary data, ALF only allows franchisees access to such information only during the course of their operation of Studios,

15

requires them to return all such information immediately upon the termination of their Studio, and stores it in highly-confidential, password-protected databases. (*Id.* at §§ VIII.J, XI.B-C, XIX.A.) *See MSC Safety Sols., LLC*, 2019 WL 5189004, at *7 (customer data constituted trade secrets where plaintiff closely protected them, disclosing only to current employees to carry out their job duties); *Blue Star Land Servs., LLC v. Coleman*, No. CIV-17-931-R, 2017 WL 6210901, at *5 (W.D. Okla. Dec. 8, 2017) (plaintiff who limited access, used passwords to protect servers, and required non-disclosure agreements took "reasonable measures to protect secrecy"). Indeed, the dissemination of ALF's clients' customized data to a competitor— Allure—has caused and will continue to cause substantial and irreparable harm to ALF given the highly competitive nature of the beauty industry. (Ex. 1, ¶¶ 34-42.) *See Blue Star Land Servs., LLC*, 2017 WL 6210901, at *5-6 (trade secret had independent economic value where defendant functioned "in a highly competitive market").

Despite ALF's protection efforts, Defendants obtained ALF's trade secrets, including ALF's client lists and data, by improper means, i.e. a breach of contractual duty to maintain their secrecy, and have been using and are continuing to use those secrets without authorization from ALF. (Ex 1, ¶¶ 21-30.)

## III.    ALF WILL SUFFER IMMEDIATE AND IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF

Courts regularly find irreparable harm in circumstances where there is an "inability to calculate damages, harm to goodwill, diminishment of competitive positions in marketplace, . . . and lost opportunities." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1263 (10th Cir. 2004). Such circumstances exist here.

To begin, the Franchise Agreement makes clear that its restrictive covenants governing the nondisclosure of Confidential Information and noncompetition are "necessary" to protect ALF's "goodwill and other business interests" and any failure to comply with such covenants "would result in irreparable harm to [ALF] for which no adequate remedy at law may be available." (Ex. 2, § XI.C(3), F.)

Further, the irreparable harm stemming from the Defendants' continued competition with ALF and use of ALF's trade secrets cannot be adequately compensated with monetary damages. ALF's brand was built and continues to survive in a highly competitive industry based on the business goodwill it has developed over the last decade through personal contacts and dedication to the unique preferences and service-needs of its clients. (Ex. 1, ¶¶ 12, 35.) ALF's focus on customized client service is not only the reason that ALF limits the access to and use of its confidential trade secrets, but also why damages stemming from loss of that goodwill are unquantifiable. (*Id.* ¶¶ 41-42.) *See Equifax Servs., Inc. v. Hitz*, 905 F.2d 1355, 1361 (10th Cir. 1990) (affirming finding of irreparable harm because plaintiff's "business is based on personal contacts and a knowledge of the special needs and requirements of customers . . . a fact which complicates any damage estimate") (internal quotation marks omitted).

For these reasons, courts in this District routinely find irreparable harm in cases, like this one, where "territorial integrity and covenants not to compete are essential to maintaining [an] established franchise network" such that harm to such established goodwill is "not readily remedied by damages." *Dry Cleaning To-Your-Door, Inc.*, 2007 WL 4557832, at *3; *Equifax Servs., Inc.*, 905 F.2d at 1361 (citing cases); Restatement (Second) of Contracts § 360(b) (Am. Law Inst. 1981) ("The breach of a covenant not to compete may cause the loss of customers of

an unascertainable number or importance."). Indeed, the difficulty of proving damages in non-compete cases has made injunctive relief the preferred remedy in Colorado. *Dry Cleaning To-Your-Door, Inc.*, 2007 WL 4557832, at *3; *DoubleClick Inc.*, 402 F. Supp. at 1260. Likewise, "diminishment of competitive positions in marketplace" and "lost opportunities to distribute unique products," including when resulting from a misappropriation of trade secrets are factors that support a finding of irreparable harm. *See Loxo Oncology, Inc. v. Array Biopharma Inc.*, No. 18-CV-03062-PAB-MEH, 2019 WL 10270263, at *5 (D. Colo. June 26, 2019*); North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999) (loss of trade secrets is an important factor when considering whether the harm is irreparable because "[a] trade secret once lost is, of course, lost forever.").

By unlawfully competing with ALF and using its trade secrets, Defendants are <u>daily</u> confusing consumers, depriving ALF of business opportunities, and diminishing ALF's goodwill and competitive position in marketplace—significant harm which cannot be estimated or projected with certainty. (Ex. 1, ¶¶ 34-42.) And—worse—Defendants are also refusing to honor some of ALF's clients' prepaid services at Defendants' ALF Studio, significantly harming ALF's brand and customer relationships. Injunctive relief during the pendency of this litigation is necessary to prevent the imminent and unquantifiable threat to ALF. (*Id.*)

## IV.    THE HARM TO ALF FAR OUTWEIGHS THE HARM TO DEFENDANTS CAUSED BY THEIR MISCONDUCT

The balance of harms in this case tips overwhelmingly in ALF's favor. Injunctive relief will simply preserve the status quo as it was before Defendants began misappropriating ALF's trade secrets and flagrantly violating their contractual obligations not to compete against ALF. Injunctive relief is necessary to allow ALF to obtain the relief it seeks on the merits when it

prevails. Holding Defendants to their agreements not to compete simply enforces their contracts with ALF. Any harm to them resulting from their inability to operate their competing business should be disregarded, given that this conduct is impermissible, and in any event Defendants will not be prevented from working elsewhere or later running such business lawfully. *See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) (defendant's injury "may be discounted by the fact that the defendant brought that injury upon itself."). In contrast, absent an injunction, ALF's position in the marketplace, customer relationships, and business competitiveness will continue to suffer daily harm.

## V.    A INJUNCTIVE RELIEF SERVES THE PUBLIC INTEREST

The injunctive relief sought by ALF serves the public interest in multiple ways. First, courts consistently recognize that the public interest is served by enforcing valid contracts and by using injunctive relief to enforce non-competition agreements. *E.g., Dry Cleaning To-Your-Door, Inc.*, 2007 WL 4557832, at *3. Here, Defendants should be held to their contracts.

Second, public policy likewise supports protecting valid trade secrets from Defendants' unlawful misappropriation and use—particularly, like those here, which involving proprietary and confidential client lists and data and the unauthorized use and disclosure of which is, and continues to be, detrimental to ALF, its relationship with its clients, and its business competitiveness. *See Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*, 86 F. Supp. 2d 1102, 1107 (D. Kan. 2000). The public interest will be served by enjoining Defendants' flagrant misuse of ALF's trade secrets.

## VI. ALF SHOULD NOT BE REQUIRED TO POST A BOND

Under Rule 65(c), courts have wide discretion in determining whether to set a bond, and the bond amount. *See* Fed. R. Civ. P. 65(c); *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987) (trial court may, in exercise of discretion, determine bond is unnecessary to secure preliminary injunction or temporary restraining order "if there is an absence of proof showing a likelihood of harm").

Here, for the reasons discussed, Defendants will not suffer any undue harm if the Court grants the requested relief. Injunctive relief will preserve the status quo by restoring the parties to the "last peaceable position" existing between them before the dispute developed. *Dry Cleaning To-Your-Door, Inc.*, 2007 WL 4557832, at *2. As mentioned, the last peaceable position was the world as it existed before Defendants began unlawfully and systematically violating their Franchise Agreement and misappropriating ALF's trade secrets. An injunction barring this conduct will not affect Defendants' future business prospects or legitimate business interests.

Moreover, Defendants "consent[ed] to the issuance of an injunction prohibiting any conduct . . . in violation of the [restrictive covenants in § XI]"—including the above-cited covenants prohibiting the misappropriation, disclosure, or unauthorized use of Confidential Information and the covenants against competition—"without the requirement that [ALF] post a bond."  (Ex. 2, § XI.F.) Therefore, an injunction bond is neither necessary nor appropriate.

## <u>CONCLUSION</u>

For the foregoing reasons, ALF respectfully requests that the Court grant ALF's Motion and enjoin Defendants' unlawful conduct, in the manner specifically set forth in ALF's Proposed Order, submitted herewith.

Dated:  June 8, 2021.                    Respectfully submitted,


                                         *s/ Kathryn A. Reilly*
                                         Kathryn A. Reilly
                                         Melissa L. Romero
                                         Wheeler Trigg O'Donnell LLP
                                         370 Seventeenth Street, Suite 4500
                                         Denver, CO 80202
                                         Telephone:   303.244.1800
                                         Facsimile:    303.244.1879
                                         Email:   reilly@wtotrial.com
                                                       romero@wtotrial.com

                                         Attorneys for Plaintiff,
                                         Amazing Lash Franchise, LLC

## **<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on June 8, 2021, a true and correct copy of the foregoing **PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** was electronically filed using the CM/ECF system and sent via email to the following.

Robert M. Einhorn
REinhorn@zarcolaw.com

Brenda Phang
BPhang@zarcolaw.com

*s/ Claudia Jones*